UNITED STATES v. POILLON. See Case No. 16,081.

## Case No. 16,061.

UNITED STATES v. POLACK et al.

[Hoff. Land Cas. 284; [2] Hoff. Op. 32.]

District Court, N. D. California. Dec. Term, 1857.

MEXICAN LAND GRANTS — ABSENCE OF ARCHIVAL EVIDENCE—POSSESSION AND OCCUPATION.

When the archives contain no evidence or trace of the existence of a grant, the court will demand the fullest and most satisfactory proofs of possession and occupation during the existence of the former government, under a notorious and undisputed claim of title; and clear and indubitable evidence of the genuineness of the grant produced.

[Cited in Bouldin v. Phelps, 30 Fed. 567.]

Claim [by Joel S. Polack and others] for the island of Yerba Buena, or Goat island, situated in the Bay of San Francisco; confirmed by the board, and appealed by the United States.

P. Della Torre, U. S. Atty., and William Blanding, for appellants.

E. L. Goold, for appellees.

HOFFMAN, District Judge. The title of the claimants is derived from a grant alleged to have been made by governor Alvarado, Nov. 8th, 1838, to Juan José Castro. The authority under which the governor acted is a dispatch from the secretary of the interior to the governor of the Californias, dated July 20th, 1838, directing him to grant the islands

on the coast in private ownership. There can be no doubt of the governor's authority to make the grant. The only dispute is as to its genuineness. Neither the petition of Castro nor any other document is produced from the archives. So far as appears, the records of the former government do not contain the slightest trace of the alleged transaction. Even the grant itself is not produced, and the claimants rely upon an alleged copy recorded in the recorder's office of this city in 1849. To prove the existence and genuineness of the original, the claimants have introduced a large number of witnesses. The United States have, on the other hand, sought to show that the grant was made by Alvarado, in the city of San Francisco, in the year 1848, and antedated. Juan José Castro, the original grantee, testifies that he presented a petition to the governor in November. 1838, at Santa Barbara, and that the grant was issued in that month; that he put sheep, goats and hogs upon the island, and retained possession of it until 1848, when he sold it to Jones for $1,000, which was paid to him in the presence of one G. H. Nye; that Alvarado and Maria C. Miranda were present when the deed was made. He adds, "If the grant was not recorded in the archives, it was the fault of the officers, not mine." The witness further states, that at the time of the sale to Jones, he delivered to the latter the original petition and grant, and all the papers relating to the title. It may be observed, in passing, that it is strange that the grantee should have had possession of the original petition—a document which was usually retained by the government, and constituted a part of the expediente on file in the archives. It is also strange that Jones, when he delivered in 1849 (not 1848, as stated by Castro) his papers to be recorded, should have omitted this document, so important to show the regularity of the proceedings. Governor Alvarado testifies in positive terms that he made the grant in 1838. That the copy produced is a substantial copy of the grant made by him. and that he was present, together with J. B. R. Cooper and his wife, when Castro executed the conveyance to Jones. Joaquin Castro, brother of the grantee, deposes that he saw the grant in the possession of the grantee in 1838 or 1839; that it was on common paper; that he read it, and that the paper produced is a copy of it substantially: that he saw his brother take some sheep in a boat to put them on the island, and that he saw the remains of a house he built there in 1843 or 1844. José Castro testifies that he was at the office of Gov. Alvarado, in Santa Barbara, in 1838, where he accidentally saw lying on the table a grant which he examined, and found to be a grant of the island of Yerba Buena to Juan José Castro. Jesus Maria Castro testifies, that in the year 1838 his brother Juan José, the grantee. went to Santa Barbara to see Gov. Alvarado. and when he came back he brought a concession for the island; that

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

in 1839 he saw the paper in his mother's hands; that all the papers relating to their rancho were in a little box; that on looking them over, he saw amongst them the title to Yerba Buena. It was signed by Gov. Alvarado, but had no seal. The witness states that he does not know whether his brother was in possession of the island when the Americans came; that he told him (witness) that he was going to put some sheep and hogs upon it. Antonio Ortega testifies, that in 1840 he asked for the island of Yerba Buena, that Gov. Alvarado said he could not give it to him, as he had already granted it to Juan José Castro; that afterwards in 1840, he with one Guerrero were in the house of a man named Hinckley when Juan José Castro arrived in a boat from San José with some hogs; that Hinckley asked what he was going to do with them, to which he replied that he was going to keep them on the island; that Hinckley asked if he would sell the island; that he said "Yes, for $3,000;" that he heard Castro tell many persons he had a title to the island. José Jesus Pico testifies that he was at the mission of San Antonio in 1839; that Juan José Castro came from below and stopped at his house; that this was in July or August of 1839; that while talking together of lands and ranchos, Castro showed him a concession of the island of Yerba Buena; that he read it—it had no seal, it was on white paper, and had a written and not a printed heading, and was signed by Gov. Alvarado.

The above are all the witnesses who testify to having seen the grant before the date of the sale to Jones. Dec. 7th, 1848. Henriques, who was the clerk to whom Jones, in 1849, delivered the grant and conveyance for record, testifies that he took particular notice of the paper; that it was Mexican paper and had a departmental stamp. Jesus Maria Castro says the title he saw had no seal. Pico says it had no heading or habilitacion. Juan José Castro says the copy produced is "an accurate copy;" but it has neither heading nor seal. Joaquin Castro says it was on common paper. It could therefore have had neither heading nor seal. José Jesus Pico says it was on white paper, and had a written and not a printed heading. That he did not pay any attention to any other part than the governor's signature, the name of the island and the heading of the paper, "as all concessions are alike." And finally, Gov. Alvarado describes it as being issued "in the usual form." These discrepancies are certainly calculated to suggest a doubt as to the reliability of the witnesses. That this concession was not "in the usual form," or like all other concessions, is obvious. Its language and form are peculiar. It contains no conditions. It refers to the superior order of Aug. 18th, 1838, instead of the laws of 1824 and the regulations of 1828. It is not signed by the secretary. It contains no direction "that a note be taken in the corresponding book." It has no seal, and has no heading or habilitacion, nor any note of the fact that common paper was used for want of stamped paper. It is difficult to imagine how the witnesses, if they really saw and if they recollect accurately the contents of the paper, could have supposed such a concession to be like all others, or "in the usual form." It is not meant, however, that there is anything conclusive in these inaccuracies. It is possible that they may have seen the title, remembered the names of the grantor, the grantee and the island, and have failed to remember precisely whether the grant had a seal or a heading. It is only when they undertake to speak positively on these points, and are found to be inaccurate, that a doubt as to their good faith is suggested. The concession is dated November 8th, 1838. Jesus Maria Castro testifies, as has been stated, that in 1838 his brother went to Santa Barbara to see Gov. Alvarado, and when he came back brought a concession for the island with him. Gov. Alvarado swears that he did not see Castro in Santa Barbara at the time of making the grant. And José Jesus Pico says that in July or August of 1839, Castro stopped at his house at the mission of San Antonio, on his way back from Santa Barbara, when he took out of his pocket, or out of the "traps" on his horse, the concession which he showed to the witness. The witness is positive as to the year 1839, and thinks that it was in July or August. If then, as Jesus Maria Castro testifies, the grantee went to Santa Barbara to procure the grant in 1838, and of course before its date, Nov. 8th, and if he, on his return from Santa Barbara in July or August, 1839, showed it to Pico, he must have taken eight or nine months to perform the journey. It would seem that so long an absence from his home could hardly have been forgotten by the grantee or his brothers; neither of them, however, mention this protracted absence, and Juan José Castro testifies that he presented a petition to Gov. Alvarado at Santa Barbara, in Nov., 1838, and that the land was granted at the date of the concession.

On the part of the United States, the principal witnesses are G. H. Nye and J. H. Brown. Nye testifies that he saw Alvarado sign a paper which he understood to be a grant of the island of Yerba Buena. That this was done at the house of John Cooper, commonly called "Jack the Soldier;" that Cooper, Alvarado, Castro, Tolivia, Jones and witness were present; that he met Jones on the way to Cooper's whither he (witness) was going to get a saddle; that he interpreted the document to Jones; that he made no remark about its being antedated; that Tolivia was asked to sign as a witness, but declined, saying he would not put his name to a false document; that but one document was made out on this occasion; that he was not asked to sign as a subscribing witness.

He further states, that after the conclusion of the business, Jones took the paper and went away; that when passing Leidesdorff's house, Jones rubbed his hands against an adobe wall, and then rubbed the paper between them, and that being asked the reason, he replied that it was to give the paper the appearance of age; that he accompanied Jones to his house, and soon after Alvarado, José Castro and the alcalde came in and the transfer to Jones was made. This witness was reëxamined in open court, after the case was removed on appeal. He then stated that the paper to which he referred was a deed from Castro to Jones, and that he saw but one document, and that it was signed by Castro and Alvarado. Jones' name was mentioned in it. The witness repeats the account of ˥ones rubbing the paper with his hands to give it an ancient appearance, and adds that afterwards Alvarado and Castro met at Jones' house, when the alcalde was called in, and the paper was signed by him. That the paper signed by the alcalde was the same paper he had seen at Cooper's house. Juan B. R. Cooper and Tolivia have both been called as witnesses by the claimants. Whatever the nature of the transaction at Cooper's house was, they are by Nye himself stated to have been present. In the copy of the deed to Jones, the name of Cooper and that of his wife, Cecilia Miranda, appear as subscribing witnesses. Cooper denies all knowledge of the ante-dated grant. He relates the circumstances of the interview, that some money was paid, and that he and his wife were called to sign a paper as witnesses; that he thinks it was a transfer or receipt for money. Tolivia Fanfaran testifies that he was present at the sale of the island by Castro to Jones; that Gov. Alvarado drew up a paper for the sale; that he was not asked to sign as a witness, nor did he decline to do so, as stated by Nye, and that the whole transaction, so far as he knew, was fair and honest.

The above testimony, with that of Alvarado, by whom, of course, the fabrication of the grant is denied, is all that relates to the transaction at Cooper's house. The theory of the United States rests on the testimony of Nye, uncorroborated, except indirectly by Brown, as will presently be noticed. Captain Nye's testimony is by no means reliable. He is shown to have sustained injury by a fall which has seriously impaired his faculties; and the evidence by him is contradictory. That a paper was drawn up and money paid by Jones at Cooper's house, is admitted. That Castro, Alvarado, Cooper, Nye, Cecilia Miranda and Tolivia were present, is also clear. The deed to Jones, a copy of which is produced, bears the signatures of Cooper, Nye, Cecilia Miranda and Alvarado. Cooper and Alvarado both swear that they signed as witnesses the paper drawn up on the occasion referred to. And Nye himself says there was but one paper, and that it was signed by Alvarado and Castro. If this be so, the paper must have been the deed to Jones, and not the grant, which was necessarily signed by Alvarado alone. If Tolivia was asked to sign, as stated by Nye, it must have been the deed he was requested to witness, and not the grant. To ask him to witness a grant by the governor, purporting to have been made ten years previously, would have been absurd. The only hypothesis on which we can suppose the grant to have been fabricated, as stated by Nye in his first deposition, is, that both the grant and the deed were drawn up at the same time. But Nye is positive that only one paper was drawn up, and this in his second deposition he states to be the deed. The story told by this witness is so confused, improbable and inconsistent and it is contradicted by so many witnesses, that it is impossible for the court to found a judgment upon the assumption of its truth. J. H. Brown testifies that he kept the City Hotel in this city, and while behind the bar heard a conversation between Alvarado and Jones, which was interpreted by Captain Nye. That the former agreed to make a title to Castro, by whom a deed should be given to Jones. That $2,000 was at first demanded, and subsequently $1,600 was agreed upon. That they agreed to meet at John Cooper's to prepare the papers. This witness describes with much particularity the place where the parties stood, and states that he attended on the court compulsorily, and only in obedience to the subpœna; that he never had heard what Nye had testified; that he had stated the circumstances three years ago to one Thompson, who was purchasing an interest in the island. Captain Nye, who was recalled after the deposition of Brown, emphatically denies ever having interpreted between Alvarado and Jones, as stated by Brown, as does also Governor Alvarado. To corroborate the proofs of the existence of the grant before 1848, the claimants have called W. H. Richardson, who swears that in 1839 he heard that Castro had a grant for the island; and Albert Packard, who testifies that in 1847 he made a translation of a grant for Yerba Buena to one of the Castros, of which he believes the paper produced to be a copy. Roland Gelston swears that in 1847 Jones asked him his opinion of its value, and stated that he had seen a grant for it to Castro. Manuel Torres testifies that on his arrival here in 1843, he asked Juan José and Joaquin Castro to whom the island belonged, and that Juan José said it was his. William Reynolds states that he was on the island in 1845, for the first time; that he there met with one Jack Fuller and Captain Hinckley; that Fuller said that the goats on the island belonged to him and one Spear, and they were on the island by permission of the owner, who was one of the Castros; witness does not recollect which. William F. Swazey, notary public, states that

in 1846 he knew Spear intimately; that he frequently talked of the goats he had on the island; and that he always was led to believe from his conversations with Spear, Fuller and others that the title to the island was in one of the Castros, and that such was his impression from general report. On the other hand, Samuel Brannan, who came to San Francisco in 1846, Sherreback, who came here in 1841, Buckelew, Leavenworth and Captain Halleck testify that they never heard of the grant until 1848. Leavenworth was alcalde up to August, 1849, and from his position may be supposed to have had some means of information. Sherreback swears that on his first arrival in 1841 he had three or four men cutting wood on the island for his ship; that there were no houses on it from 1841 to 1845; that he never heard of a title to the island until August or September, 1848, when Jones told him he had purchased it from Alvarado. The witness is positive that Jones said he purchased it from Alvarado, and that Castro's name was not mentioned. He also states that he has seen Alvarado and Jones conversing together at his house several times, and that Nye interpreted between them—as Jones did not speak one word of Spanish. That on one occasion Jones, Alvarado and Nye came out of the sitting-room together; that Alvarado and Nye went away, but Jones stopped to pay for the refreshments they had had; and that Jones then stated he had bought the island from Alvarado. If this account be true, it disproves the testimony of Nye and Alvarado, who both deny ever having had such interviews. With regard to Jones' inability to speak "one word of Spanish," Sherreback is contradicted by Colonel Stevenson, who says that Jones spoke Spanish as well as Americans generally do; that Jones was an educated man, etc.

George Patterson, who came to this country as a sailor before the mast, and now keeps a bar for retailing liquor, says that he was on the island in 1840; that from that time until 1848 he has been there repeatedly; that he saw no cattle or cultivation of any kind, nor heard of any title until 1848; heard that Jones had a title, but never heard that Castro had; knows that Castro had a title to an island adjoining the Peralta claim, called "Brooks' Island"; that Fuller and Spear had goats on Yerba Buena island; and that in 1842 two men named Cozzens and Smith had sheep upon it. He never saw a hog upon it. The credibility of this witness is somewhat impaired, however, by his statements on cross examination respecting his intimacy with Castro, with whom he was evidently unable to communicate, as he cannot speak Spanish; by his denial that Dowling, who is principally interested in defeating this claim, ever spoke to him about the testimony he was to give, although he was subpœnaed by Dowling, and has since been twice at his house; and by his statement that when told the district attorney wanted to see him, "he could not imagine what it was for," &c., &c. Benjamin R. Buckelew testifies that at the end of 1848 or beginning of 1849, he had "a very distinct conversation" with Jones respecting the island. That he, witness, expressed, as he had previously done, his doubts whether Jones would get it acknowledged by the United States; that Jones asked his reasons: to which he replied, that Jones and himself and all the old settlers knew it to be vacant land; that Jones replied, "that would make no difference, as he had the title so fixed and fastened that the United States could not avoid acknowledging it." The witness adds that he frequently stated to Jones that if any one had a right to the island it was Fuller and Spear; that they were in possession of it when he and Jones came to the country, and up to 1848. He further states that up to 1848, there were no buildings on the island. Captain Halleck, who came to this country in 1847 as an officer of engineers, testifies that it became his duty to examine into and report upon the titles of places to be reserved for army and navy depots; that after inquiry, he found no title or claim to Yerba Buena Island, and reported it as vacant. He also states, that in a conversation with Jones in 1850, he mentioned to him the reports that the title was made in this town in 1850 and antedated, and that he subsequently admitted the fact. This admission was made, however, after Jones had sold the island, and cannot be received in evidence. The witness also states, on his cross examination, that amongst those of whom he inquired as to the existence of a title to the island, was W. A. Richardson; and that from no source did he learn that any existed, nor did he hear of any until the end of 1848 or beginning of 1849. It is to be remembered that Richardson swears that Castro built a house on the island; that he knew of the grant to Castro; and that he had Indians on it whenever he saw it—the last time being in 1841. A report made by Captain Halleck to Assistant Adjutant General Turner in 1847, is produced, in which Yerba Buena is mentioned, and a recommendation made that measures be taken to secure a title to it and other military points mentioned. Yerba Buena is certainly not in this report stated to be "vacant public land." If Capt. Halleck alludes to this report as that wherein he reported the island vacant, he is evidently mistaken. There is nothing however in the language of the report, or the suggestion that a title should be secured to the island, which is necessarily inconsistent with the idea on the part of the writer that the land was vacant. But whatever errors the witness may have fallen into with regard to the contents of his reports, it is almost impossible that he should be mistaken as to the fact which he states so positively, that he did not hear of any title to the island. He swears that Richard-

son, then collector of the port under the Americans, accompanied him and Capt. Warner to Angel island, Alcatras and Point Caballos; and that he showed them where to land on Yerba Buena island. As the object of these visits was to examine the sites, and the officers were directed to obtain information as to the titles of the various military points, it is impossible that they should not have been informed by Richardson of the title to Yerba Buena island, if the latter had then heard of any; nor is it conceivable that if informed by Richardson of Castro's title, Capt. Halleck should have forgotten it. The conflict, therefore, between Capt. Halleck's testimony and Richardson's is irreconcilable, unless we suppose Richardson, when inquired of by Halleck, to have willfully and without an object stated that there was no title, knowing all the time that, as he has since sworn, Castro had a title, and had built a house for Indians upon it.

Much other testimony has been taken in this case which I do not think it necessary particularly to examine. On reviewing the whole testimony, it is impossible not to feel that the claim set up is liable to the gravest suspicion. The only witnesses who pretend to have seen the grant before the American occupation differ from each other on all points except those essential to be established, viz., the names of the grantor and the grantee and of the island. The existence of the grant seems to have been known to but a very small number of people, and to have been unknown to persons such as Buckelew, Sherreback, Brannan and Leavenworth, who would probably have heard of it. The grant itself is not produced, that its genuineness might be judged of on inspection. No trace of its existence, or of any application for it, appears in the archives. There has been no occupation of the land, even if the claimants' witnesses are believed, which could be deemed to amount to a possession of it, or even to the assertion of a claim to it. The claimants' own witness, Ortega, testifies that in 1840 he applied for a grant of the island, which Alvarado refused. Admitting this to be true, it proves that Ortega at least thought it vacant—an idea incompatible with the exercise by Castro of open and notorious proprietary rights.

If the only question in the case was—"Have the United States proved the grant to have been fabricated in Cooper's house in 1848," perhaps, under the proofs, the answer would be in the negative. But amidst all the inconsistencies, contradictions and retractions in the depositions of Capt. Nye, he constantly adheres to the story of Jones rubbing the paper to give it an appearance of age. This story he repeats in his second deposition, although obviously willing at that time to qualify as far as possible his former testimony. It is told with a circumstantiality which gives to it the air of a narrative of an actual occurrence. The mental imbecility which the claimants have been at pains to prove, though it might lead him to confound one paper with another, would hardly allow

him to invent such an incident, or after so long an interval to repeat the invention with so much accuracy. Brown, too, corroborates his story. He is positive and clear, nor has his character been impeached. That Alvarado, Castro, Nye and Jones were present at the hotel, though positively denied by Alvarado, is testified to by Sherreback; and the suggestion that their conversation might have related to the mistaken date of the superior order under which Alvarado acted, and which was misunderstood, or has been misrepresented by Brown, admits that Alvarado has sworn falsely in denying that such interviews ever took place.

It seems to me that the case is one in which the court should require, before pronouncing in favor of the claim, either record evidence from the archives of the former government, or at least that proof of the genuineness and date of the grant afforded by a notorious and unequivocal occupation of the land and the assertion of a right of ownership to it. It is not pretended, or at least no proof whatever has been offered to show, that an expediente of the proceedings with reference to the grant ever existed. The petition itself was, if Castro is to be believed, delivered first to him, and then by him to Jones. It is unaccountable that it should not have been recorded with the other papers. The book mentioned in Capt. Folsom's deposition as having been burnt, contained merely a note or list of titles. No evidence is offered that this grant was among the number. Had a note been taken of it in the "corresponding book," a memorandum to that effect would in all probability have been made at the foot of the grant by the secretary, as was usual. But this grant contains none such, nor is it even signed by the secretary. The authority under which the governor acted directed him to grant "de acuerdo" with the departmental assembly. It would seem, therefore, that their concurrence or approval was required in this as in ordinary colonization grants. From 1838 to 1846, while the assembly was in session, it was never presented to that body. The only explanation offered is that given by Alvarado, viz.: That the assembly resolved "that the governor should act under the order without further advice from them." No resolution to this effect is produced. The fact rests on the bare statement of Alvarado. As against the Mexican government, this grant, even if genuine, is barren of all equities. The object of the superior order of the twentieth of July, 1828, was to protect the islands on the coast from settlement by foreign adventurers, and from becoming a resort for smugglers. It is difficult to see how placing a few sheep and hogs upon this island, supposing it to have been done, could have in any degree fulfilled the intentions of the granting power. If occupation and settlement were required in any case, it would seem that in a grant made under the motives and policy which dictated this, they should surely have been insisted on. That the island was never occupied by the grantee is, I think, established beyond reasonable doubt. Even his own brother is unable

-to state whether he ever took possession of it. From 1840 to 1847 no one was living on it. Capt. Nye swears that he has known it twenty-two years, and that in 1836 he put goats upon it. From these is probably derived its popular name of "Goat Island." The fact of Castro's placing hogs and sheep upon it, if he in truth did so, can neither be regarded as any substantial settlement or occupation; nor even as evidence of the assertion of a title to it in himself. If then the concurrence of the assembly be deemed to have been necessary to fully transfer the title of the Mexican nation to the grantee, the grant unapproved would constitute an inchoate or imperfect title, and the fulfillment of the implied conditions and the performance of the acts which constituted the only consideration for it, would seem necessary to perfect the equity of the grantee and entitle him to demand a confirmation at the hands of this or the former government. But this objection to the claim it is unnecessary further to consider, for the claim must be rejected on other grounds. In the recent case of U. S. v. Cambuston [20 How. (61 U. S.) 59], it is clearly intimated by the supreme court that in cases-like that under consideration, record evidence of the grant should be produced, or its absence satisfactorily accounted for. Neither has been done in this case. The case presented is not that of a Californian, found at the acquisition of the country living on his rancho, under a claim of title notorious and undisputed, and who merely asks the United States to recognize his rights. On the contrary, the application is for a title from the United States to parties who have never inhabited, occupied or cultivated any portion of the land solicited. Engaged as this court has been for several years in the investigation of these cases, it is idle to disguise the fact already notorious in the country and so often painfully apparent to the court, that the parol testimony by which these claims have been sought to be established, is in many instances utterly unreliable. The best if not the only tests of the genuineness of an alleged grant are to be found in the record evidence contained in the archives, and in the fact that the land has been occupied under a notorious claim of title recognized by the former government. Under the decision of the supreme court in the case of U. S. v. Fremont [18 How. (59 U. S.) 30], the latter of these tests cannot in general be applied; for the non-occupation can usually be excused or accounted for by parol proofs. The later case of U. S. v. Cambuston [20 How. (61 U. S.) 59] seems to indicate that the supreme court are resolved to apply the former test with rigor. But at least it may be asserted with confidence, that where there is no trace of the grant in the archives, no possession or unequivocal claim of ownership during the continuance of the former government, and the grant itself is not produced, the court should demand the clearest and most indubitable proofs of the genuineness of the title. If such be not offered, and if the testimony as in this case be conflict-ing and unsatisfactory, it is the duty of the court to pronounce the claim not proved. Such, after the most careful consideration, I feel to be my duty in the case at bar.